**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WENDY CLARKE, DEBORA DUFFY, and SHARON ROSS<br><br>***Plaintiffs***,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION<br><br>***Defendant***. | Case no. 7:26-cv-8179 |

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs Wendy Clarke, Debora Duffy, and Sharon Ross bring this action against International Business Machines Corporation ("IBM") under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and applicable state anti-discrimination laws. Plaintiffs allege that IBM selected them for termination because of their age under the pretext of a reduction in force and retaliated against them for engaging in statutorily protected activities. Although Plaintiffs were qualified, high-performing employees, IBM terminated them while their work continued to be performed by younger employees or was otherwise backfilled through IBM's younger-worker hiring pipeline. Plaintiffs allege as follows:

## I. STATEMENT OF THE ACTION

### A. Introduction

1. This case is the latest chapter in IBM's continuing, companywide effort to remove older, experienced employees from its workforce and replace or backfill them with younger employees. IBM's scheme began at the highest levels of the company, was carried out through rolling

Resource Actions ("RAs"), and has continued through shifting labels and public rebranding. Plaintiffs Sharon Ross, Wendy Clarke, and Debora Duffy were all long-tenured, high-performing IBM employees, aged 58, 59, and 57, respectively, and therefore within the ADEA's protected age group. Ms. Ross and Ms. Clarke were Client Success Managers at Band 9; Ms. Duffy was a Band 9 Associate Project Manager. Each had dedicated decades of service to IBM, had excellent performance records, and possessed the skills and experience necessary to continue performing her job. Each was terminated under the asserted pretext of a supposed reduction in force.

2. IBM notified each Plaintiff on or about September 17, 2024, that her employment would end effective October 17, 2024, or, in Ms. Duffy's case, later due to an approved leave of absence. IBM told Plaintiffs that their positions were being eliminated and that business needs required a reduction in force. Those explanations were false. IBM was *not* eliminating the work Plaintiffs performed, and IBM continued to need employees to perform the same or substantially similar functions. To the contrary, while Plaintiffs were being told that their jobs were disappearing, IBM management was actively planning to backfill many of *those very roles and functions* Plaintiffs had performed—but this time with younger employees.

3. That truth was inadvertently revealed through an internal IBM communication on which one of the Plaintiffs was accidentally copied. Between the time Plaintiffs received notice of their termination and the time they left IBM, an IBM Vice President unintentionally included one of the Plaintiffs on internal Slack communications which confirmed that IBM was not merely reducing headcount but instead was interviewing and hiring younger employees to replace some workers selected for termination for the *exact same positions*. This smoking-gun communication revealed the same high-level plan that IBM has been executing for years—to backfill laid off older employees with younger Early Professional Hires, later rebranded as Entry Level Hires, or "ELH."

### B. THE SCHEME

4. IBM first developed a top-down strategy to reshape its workforce by removing older employees and hiring younger workers. It then used corporate language, RAs, performance mechanisms, secretive selection processes, transfer barriers, and public rebranding to conceal the age-based nature of that strategy. When scrutiny increased, IBM changed the terminology, but not the practice. Plaintiffs' terminations show that the same scheme remains in place today.

5. Under this scheme, IBM uses companywide methods to target and eliminate older workers while protecting and hiring younger employees. The strategy came from the highest levels of IBM. Senior executives developed and implemented the plan, while Human Resources and Finance used workforce analytics, scoring systems, and financial modeling to identify older employees for RAs and justify mass exits. IBM Legal devoted significant time and resources to procedures designed to avoid detection and minimize transparency.

6. Veiled corporate language, employed by the highest-level executives, worked to obscure actions designed to fire the old and to make way for the young. Executive planning documents, previously obtained by undersigned counsel, are replete with terms such as "Early Professional Hire," "seniority mix," "skills remix," "next generation," "refresh," "revitalization hiring," "reinvention of the workforce," and "transformation"—coded corporate language that permitted executives to discuss illegal discrimination in a way that avoided detection, gave cover, and provided plausible deniability. As of late 2021, IBM confirmed that many of these documents "provide insight into IBM's decision-making processes that are still being used today."[1]

---

[1] *See* Decl. of Sam Ladah, *Townsley v. Int'l Bus. Machines Corp.*, No. 1:20-cv-00969-LY, Aug. 27, 2021 (WDTX) ECF No. 59-2.

7. To execute the scheme, IBM's executives mandated companywide rolling layoffs—which IBM called "Resource Actions"—that were designed to disproportionately target and terminate older workers. This scheme was companywide—but purposefully broken up into smaller sub-groups across business units to better shroud its discriminatory animus in secrecy.

8. Orders were given to create impossible-to-meet performance goals for older workers. Failure to achieve the impossible was then used by IBM to create baseless negative performance reviews to justify subsequent terminations. IBM also employed techniques to reduce employees' favorable performance review scores—which gave cover for terminations.

9. Evidence exists that IBM's HR department and executives several levels up from an employee's front-line manager placed employees on secret internal RA lists marking them for termination, long before first-line managers even knew that their subordinate had been pre-selected for termination. IBM then used first-line managers as cat's paw for discriminatory termination decisions already approved by HR. HR then obfuscated the termination decision to make it appear as though the first-line manager had independently decided to terminate the employee.

10. In *Langley v. IBM*, a federal court analyzed similar IBM corporate planning documents and concluded that they supported a triable question as to whether IBM executives sought to lay off older workers in order to hire a younger workforce. The court also found evidence that IBM's top-down process influenced first-line managers' termination decisions, supporting a "cat's paw" theory of discriminatory causation. The Southern District of New York has likewise recognized that similar IBM documents are directly relevant to ADEA claims where, on their face, they appear to show an effort to remove older employees in favor of younger employees.[2]

---

[2] *Lohnn v. Int'l Bus. Machines Corp.,* No. 21-CV-6379 (LJL), 2022 WL 364320, at *12, *6 (S.D.NY. Jan 4, 2022), appeal withdrawn, No. 22-32, 2022 WL 182320899 (2d Cir. July 25, 2022).

11. While firing its older workers, IBM was simultaneously busy hiring young employees, *en masse*, to replace the older workers that were laid off. To hide the replacement, IBM would frequently create different job titles and shift organizational structures to make it harder to detect that they had not eliminated a position, but instead merely replaced older workers with younger workers to perform the same work.

12. To ensure that the RAs did not accidentally target IBM's coveted young Early Professional Hires, IBM skewed the pool of people who could be targeted by creating policies that explicitly excluded younger employees, despite their job performance, from the annual layoffs.

13. IBM also employed complex and byzantine procedures to prevent targeted older employees from finding new jobs at IBM for which they were qualified. This included policies that prohibited laid off employees from transitioning into new roles or new jobs at a lower level. IBM also created and implemented policies that reclassified fired older employees as retirements or performance-based terminations.[3]

14. Over the last several years, IBM's leadership has embarked on a massive "reinvention" and rebranding campaign aimed at attracting younger employees. IBM developed a strategy to "bring in as much *young* talent into the workforce[.]"[4] It was not only IBM's recent assessment of young people's potential that drove its "transformation," but also an established corporate culture that not only questioned the relative value of older workers but frequently perceived their ability to contribute with contempt. In an IBM publication, "Myths, exaggerations and uncomfortable

---

[3] Similar sealed documents were discovered in prior litigation handled by the undersigned. *See Langley v. Int'l Bus. Machines Corp.*, No. A-18-CV-443-LY ,2019 WL 4577115, at *3 (W.D. Tex. Sept. 20, 2019); *see also Townsley v. Int'l Bus. Machines Corp.*, No. A-20-CV-00969-DAE, 2022 WL 2655197, at *2 (W.D. Tex. July 8, 2022).

[4] Shivani Shinde Nadhe, *IBM's new team to focus on millennials*, BUSINESS STANDARD (May 31, 2024), https://www.business-standard.com/article/companies/ibm-s-new-team-to-focus-on-millennials-116053000677_1.html.

truths – The real story behind Millennials in the workplace," IBM flattered the younger generation of workers it sought to recruit.[5] Several years later, ProPublica reported in the investigative reporting article, "Cutting Old Heads at IBM," that IBM was disparaging older Gen X and Baby Boomer employees. The article also included a quote from an IBM consulting services publication titled "The Maturing Workforce," which referred to older workers as "gray hairs" and "old heads."[6]

15. Years later, IBM publicly doubled down on these stereotypes, characterizing older employees as suffering from workplace "dysfunctions."[7] Finding that "older employees" were allegedly less trusting of their co-workers, less collaborative, less committed, less accountable, and less attentive to results compared to younger employees, IBM found that Boomers were the least likely to understand IBM's business strategy, least likely to understand their manager's expectations of them, least likely to understand what customers wanted, and the least likely to understand IBM's brand.[8] And while these publications may be from several years ago, IBM's obsession with reducing the age of its workforce by hiring the youngest generations continues. Recently, IBM published an article aimed at "get[ting] the Gen Z generation excited about good-paying jobs" at IBM.[9]

16. IBM's discrimination against older workers is predicated on the erroneous stereotype that younger people are better at learning, understanding, and selling technology than their seasoned

---

[5] Mark Eltringham, *Myths and Uncomfortable Truths*, WORKPLACE INSIGHT (Feb. 27, 2015), https://workplaceinsight.net/ibm-exposes-myths-exaggerations-and-uncomfortable-truths-about-generation-y/.

[6] Peter Gosselin, *Cutting 'Old Heads' at IBM*, PROPUBLICA (March 22, 2018), https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/.

[7] Managing Millennials: 5 Common Issues Leaders Face (August 24, 2016). The original content has been removed.

[8] *Id.*

[9] IBM Z for Gen Z Part 1 March 22, 2024, https://community.ibm.com/community/user/ibmz-and-linuxone/blogs/sandeep-batta/2024/03/22/ibm-z-for-gen-z-part1?communityKey=b8b88f20-24c8-49f0-9021-4a8c6247a067.

colleagues. Internal documents show that IBM's highest executives harbored an age bias, which continues to this day. Those at the company's zenith love the ***energy*** of the youthful and applaud derogatory and demeaning terms for IBM's experienced older workers. As reported by the *New York Times*, top IBM executives were directly involved in discussions about the need to reduce the portion of older employees at the company, sometimes disparaging them with the term "dinobabies."[10] This animus motivated IBM to create and conceal a company-wide, multi-faceted "fire-and-hire" scheme to attain its ultimate goal—making IBM's workforce young.

17. Internal documents show that IBM's most senior executives confirmed that they believed and anticipated that the scheme would be successful, and that the percentage of young workers comprising IBM's workforce would *improve* once Resource Actions were completed. The executives were correct. The plan worked. As found by the EEOC's multi-year investigation, statistical analysis of the data from 2013 to 2018 determined that IBM's Resource Actions targeted "primarily older workers (85.85%) in the total potential pool of those considered for layoff."[11]

18. IBM has also continued to conceal exactly how successful the scheme was by refusing to comply with the Older Workers Benefit Protection Act ("OWBPA"). Otherwise, compliance would have required IBM to provide terminated employees with the ages of other workers being laid off. IBM's failure to comply with the OWBPA prevented the older workers from seeing the big picture: they were being collectively terminated to make room for younger workers recruited to replace them.

---

[10] Noam Scheiber, *Making 'Dinobabies' Extinct: IBM's Push for a Younger Work Force,* THE NEW YORK TIMES (February 12, 2022), https://www.nytimes.com/2022/02/12/business/economy/ibm-age-discrimination.html.
[11] Gosselin, *The U.S. Equal Employment Opportunity Commission Confirms a Pattern of Discrimination at IBM*, PROPUBLICA, (Sept. 11, 2020).

### C. DESPITE PUBLIC SCRUTINY, THE SCHEME CONTINUES THROUGH PRESENT DAY

19. Years of litigation, discovery, EEOC investigation, court analysis, and public reporting exposed IBM's preference for and pursuit of EPHs and younger employees. The Equal Employment Opportunity Commission ("EEOC") conducted an independent investigation of IBM's practices and found reasonable cause to believe that IBM discriminated against older workers on account of age.[12] Public reporting likewise described IBM's efforts to eliminate older workers and replace them with its preferred younger employees.[13] As scrutiny mounted, IBM changed the label to Entry Level Hires, or "ELH." This new descriptor of IBM's preferred employee, adopted solely to cover its tracks, did nothing to alter the substance of the practice. IBM continues to remove older employees through RAs while protecting, prioritizing, and promoting the hiring of younger workers to create what IBM publicly calls a future talent pipeline.

20. Far from being over, IBM continues its ageist scheme to rid itself of its older workers. In a nearly identical age-discrimination lawsuit against IBM, current IBM executive Sam Ladah—in an attempt to keep incriminating IBM executive-level planning documents confidential—attested that these documents remained relevant to IBM's current business practices. On August 27, 2021, he attested that "even though some of the documents are five to six years old, they provide insight into IBM's decision-making processes **that are still being used today**," that the documents contain "IBM's ***current*** thinking and decision-making process," and that "IBM continues to hire along similar tracks today."[14]

---

[12] *See* **Exh. 1**, EEOC Determination Letter.
[13] Peter Gosselin, *Cutting 'Old Heads' at IBM*, PROPUBLICA (March 22, 2018), https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/.
[14] *See* Decl. of Sam Ladah, *Townsley v. Int'l Bus. Machines Corp.*, No. 1:20-cv-00969-LY, Aug. 27, 2021 (WDTX) ECF No. 59-2 (emphasis added).

21. Despite announcing in 2022 that no more major layoffs would occur, in 2023 CEO Arvind Krishna approved the termination of thousands of older employees through the tried-and-true "fire-and-hire" RA scheme. A recently leaked video of Krishna further confirms that IBM has continued using secretive, top-down pressure to shape workforce demographics according to the preferences of its Executives.[15] In that video, Krishna told employees that if they do not hire the desired race of employee, he would ensure they lost their bonuses.

22. IBM has now publicly confirmed that this practice is ongoing. In 2026, IBM's Chief Human Resources Officer announced that IBM would triple its United States hiring across every business unit.[16] IBM explained that this expanded entry-level hiring was intended to preserve a future talent "pipeline." IBM's CEO likewise publicly represented that IBM's overall employment has ***increased*** in past years.[17]

23. Those public statements are consistent with what Plaintiffs saw internally: while IBM was telling older workers that their jobs were being eliminated, IBM was simultaneously planning and celebrating aggressive hiring of younger employees. IBM's asserted reduction in force was therefore not a genuine elimination of Plaintiffs' work at all. It was part of the same ageist "fire-and-hire" scheme that the EEOC, courts, employees, and investigative journalists have already identified: remove older workers under the guise of business restructuring while concealing the discriminatory selection process, restrict older workers' ability to transfer into open roles to avoid legally required transparency, and refill the workforce with younger employees under new labels.

---

[15] Okeefe Media Group, *Leaked IBM Video*, INSTAGRAM, (December 11, 2023), https://www.instagram.com/okeefemedia/reel/C0u7vvDMypu/.
[16] HR Chief Magazine article, https://hrchiefmagazine.com/news/ibms-nickle-lamoreaux-buys-the-dip-on-entry-level-talent
[17] Wall Street Journal article, https://www.wsj.com/articles/ibm-ceo-says-ai-has-replaced-hundreds-of-workers-but-created-new-programming-sales-jobs-54ea6b58

24. Court documents and available evidence accordingly reveal that IBM's ageist scheme remains alive and well. The labels have changed, the public messaging has changed, and IBM has attempted to obscure its practices through new language and additional subterfuge. But the same scheme continues: older workers are selected for termination under the guise of restructuring, their work continues, and younger employees are retained, hired, or targeted to perform the same or substantially similar work. Wendy Clarke, Debora Duffy, and Sharon Ross are among its newest victims.

## II. PARTIES

25. Plaintiff Wendy Clarke is a citizen of the United States and is a resident of the State of Massachusetts. She timely filed a charge of age discrimination with the EEOC after she was terminated at age fifty-nine (59) as a direct result of IBM's ageist scheme to fire its older workers.[18] Plaintiff Clarke was in the protected age group at the time of the adverse employment actions and was entitled to protections consistent with the goals promulgated by the ADEA and Massachusetts State Human Rights Laws. Plaintiff Clarke was discriminated against through this illegal scheme which resulted in an adverse employment action because of her age. She was also illegally retaliated against. She brings this case to vindicate her rights under the ADEA and the Massachusetts State Fair Employment Practices Act; M.G.L., Chapter 151B, § 4.

26. Plaintiff Debora Duffy is a citizen of the United States and a resident of the State of New York. She timely filed a charge of age discrimination with the EEOC after she was terminated at age fifty-seven (57) as a direct result of IBM's ageist scheme to fire its older workers.[19] Plaintiff Duffy was in the protected age group at the time of the adverse employment actions and was

[18] *See* **Ex. 2**, *Clarke EEOC Charge,* pgs. 1 – 2.
[19] *See* **Ex. 3**, *Duffy EEOC Charge*, pgs. 1 – 2.

entitled to protections consistent with the goals promulgated by the ADEA and the New York State Human Rights Laws. Plaintiff Duffy was discriminated against through this illegal scheme which resulted in an adverse employment action due to her age. She brings this case to vindicate her rights under the ADEA and the New York State Human Rights Laws; N.Y. Executive Law § 296 *et seq*.

27. Plaintiff Sharon Ross is a citizen of the United States and a resident of the State of Florida. She timely filed a charge of age discrimination with the EEOC after she was terminated at the age of fifty-eight (58) as a direct result of IBM's ageist scheme to fire its older workers.[20] Plaintiff Ross was in the protected age group at the time of the adverse employment actions and was entitled to protections consistent with the goals promulgated by the ADEA and the Florida Civil Rights Act. Plaintiff Ross was discriminated against through this illegal scheme which resulted in adverse employment actions due to her age. She was also illegally retaliated against. She brings this case to vindicate her rights under the ADEA and the Florida Civil Rights Act, §§ 760.10(1), (7).

28. Defendant IBM is a New York corporation with its principal place of business in Armonk, New York. IBM is a technology company that provides both equipment and services in the fields of computer hardware, computer software, cloud computing, data analytics and artificial intelligence. IBM is a Fortune 500 company that employs hundreds of thousands of people.

## III. <u>JURISDICTION AND VENUE</u>

29. This Court has subject matter jurisdiction over Plaintiffs' claims under 29 U.S.C. § 626 (b), which authorizes federal jurisdiction over any action to enforce the ADEA. Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because

[20] *See* **Ex. 4**, *Ross EEOC Charge*, pgs. 1 – 2.

each Plaintiff is a natural person seeking redress for Defendant's violations of their civil rights under the ADEA.

30. This Court has supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367.

31. Venue is proper in the Southern District of New York with regard to Defendant IBM under 28 U.S.C. § 1391 because IBM has its headquarters in Armonk, Westchester County, New York.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

32. All Plaintiffs timely filed a Charge of Discrimination with the EEOC and equivalent state agencies alleging age discrimination within the requisite statutory period. Such filings occurred within 180 days of the unlawful employment practices alleged in this Complaint. More than 60 days have passed since the filing of these charges.

## V. PLAINTIFF-SPECIFIC FACTS

33. Each Plaintiff suffered adverse employment actions from IBM, including termination and denial of meaningful transfer or placement opportunities. Plaintiffs allege that age was the but-for cause of those adverse actions. The circumstances surrounding Plaintiffs' terminations follow the same patterns and tactics alleged throughout this Complaint.

34. Those tactics included selecting older workers for termination without a legitimate performance-based reason, using centralized or opaque decision-making processes rather than Plaintiffs' direct managers' independent judgment, replacing or backfilling their work with younger employees, and discouraging or blocking older terminated employees from obtaining open positions for which they were qualified. Similarly situated plaintiffs in other lawsuits have alleged the same pattern, supported by documentary evidence.

### A. PLAINTIFF WENDY CLARKE

35. Plaintiff Wendy Clarke dedicated over thirty-six years of her life to IBM as a loyal, high-performing employee. During her long career she received multiple promotions, raises, performance bonuses, equity awards, and consistently high marks on her performance reviews. Ms. Clarke was never placed on a Performance Improvement Plan or given any type of disciplinary action during her employment at IBM. Most recently, as a Client Success Manager, Ms. Clarke was responsible for directly working with large IBM customers in the deployment of purchased enterprise software and supporting IBM Executive Sales Leaders tasked with growing IBM software sales. During Ms. Clarke's employment, she completed hundreds of hours of internal IBM skills training. Ms. Clarke's job performance was never criticized in any manner by IBM, and she was never told that her skills or training were lacking.

36. Despite Ms. Clarke's long tenure, raises, advancements, training, and positive performance assessments, IBM notified Ms. Clarke of her termination on September 17, 2024, allegedly as part of an RA. She was 59 years of age at the time. But high-level planning documents circulated at IBM's leadership level—dated less than a month after Ms. Clarke's firing—specifically noted that IBM *was* hiring, but that it was hiring only a mix of 60% Early Professionals and 40% Campus Hires. Said differently, internal documents show that Ms. Clarke was a victim of the scheme as discussed *supra*.

37. Ms. Clarke was formally told by IBM that her job was being eliminated, but this was not true. Ms. Clarke's job continued to be performed due to the critical nature of the work. Ms. Clarke was fired under false pretenses.

38. After being notified of her termination, IBM offered no assistance in finding Ms. Clarke a new role. She applied for three open positions within the company and, despite being eminently

qualified, was rejected for each position without explanation all while IBM continued to actively recruit and hire younger employees.

39. Upon her termination, Ms. Clarke's job responsibilities were assigned to younger employees. In addition to Ms. Clarke, three of the oldest members of Ms. Clarke's group were also terminated by IBM at the same time. All three of those former employees had more than 25 years of IBM service.

**B. <u>PLAINTIFF DEBORA DUFFY</u>**

40. Plaintiff Duffy dedicated over twenty-seven years of her life to IBM as a loyal, high-performing employee. During her long career she received multiple promotions, raises, performance bonuses, equity awards, and consistently high marks on her performance reviews. Ms. Duffy was never placed on a Performance Improvement Plan or given any type of disciplinary action during her employment at IBM. Most recently, as a CIO Identity Program Manager, Ms. Duffy was responsible for compliance and project management, including internal and external IBM data security, privacy and audit compliance.

41. During her employment with IBM, Plaintiff Duffy received advanced professional certifications in project management and completed hundreds of hours of internal IBM skills training. She was never told that her skills or training were lacking.

42. Despite her long tenure, raises, advancements, training, and positive performance assessments, IBM notified Ms. Duffy of her termination on or about September 14, 2024, allegedly as part of an RA. Her last day of employment at IBM was delayed until January 9, 2025 due to FMLA. At the time of the termination, she was 57 years of age. She was told her job was being eliminated, but it was not. It continues to be performed due to the critical nature of the work. Ms. Duffy was fired under false pretenses.

43. After being notified of her termination, IBM offered no assistance in finding Ms. Duffy a new role. She applied for an open position within the company and, despite being eminently qualified, was rejected without explanation all while IBM continued to actively recruit and hire younger employees, including for her exact position.

### C. Plaintiff Sharon Ross

44. Plaintiff Ross dedicated over thirty-two years of her life to IBM as a loyal, high-performing employee. During her long career she received multiple promotions, raises, performance bonuses, equity awards, and consistently high marks on her performance reviews. Ms. Ross was never placed on a Performance Improvement Plan or given any type of disciplinary action during her employment at IBM. Most recently, as a Client Success Manager, Ms. Ross was responsible for directly working with large IBM customers in the deployment of purchased enterprise software and supporting IBM Executive Sales Leaders tasked with growing IBM software sales.

45. During Ms. Ross's employment, she completed hundreds of hours of internal IBM skills training. Ms. Ross's job performance was never criticized in any manner by IBM, and she was never told that her skills or training were lacking.

46. Despite Ms. Ross's long tenure, raises, advancements, training, and positive performance assessments, IBM notified Ms. Ross of her termination on September 17, 2024, allegedly as part of an RA. She was 58 years of age at the time. But high-level planning documents circulated at IBM's leadership level—dated less than a month after Ms. Ross's firing—specifically noted that IBM *was* hiring, but that it was hiring only a mix of 60% Early Professionals and 40% Campus Hires. Said differently, internal documents show that Ms. Ross was a victim of the scheme as discussed *supra*.

47. To wit, Ms. Ross was formally told by IBM that her job was being eliminated, but this was not true. Ms. Ross's job continues to be performed due to the critical nature of the work. Ms. Ross was fired under false pretenses.

48. After being notified of her termination, IBM offered no assistance in finding Ms. Ross a new role. She applied for seven open positions within the company and, despite being eminently qualified, was rejected for each position without explanation all while IBM continued to actively recruit and hire younger employees, including for her exact position.

49. Upon her termination, Ms. Ross's job responsibilities were assigned to younger employees. In addition to Ms. Ross, three of the oldest members of Ms. Ross's group were also terminated by IBM at the same time. All three of those former employees had more than 25 years of IBM service.

50. At bottom, IBM terminated and discriminated against Plaintiffs because of their age and as part of IBM's broader effort to make room for favored Early Professional or Entry Level Hires. IBM wrongfully targeted Plaintiffs in the asserted reduction in force, despite their qualifications and strong performance, and their work continued to be performed by younger employees or through younger-worker backfills. But for IBM's age-based scheme and age-based animus, Plaintiffs would not have been terminated.

## VI. CAUSES OF ACTION

### A. CLAIMS AGAINST DEFENDANT IBM

**Count 1. Age Discrimination in Employment Act, 29 U.S.C. § 621 ("ADEA") on Behalf of All Plaintiffs.**

51. Plaintiffs incorporate by reference all allegations in this Complaint.

52. IBM terminated Plaintiffs because of their age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1). Plaintiffs were at least forty years of age, qualified for

their positions, suffered adverse employment actions, and were terminated under circumstances giving rise to a plausible inference of age discrimination, including IBM's replacement or backfilling of their work with younger employees and its broader age-based workforce strategy.

53. Age was the but-for cause of their terminations and related adverse employment actions.

54. IBM's violations of the ADEA were knowing and willful, entitling Plaintiffs to all remedies available under the ADEA, including liquidated damages where permitted by law.

55. As a direct result of IBM's pretextual termination because of their age, Plaintiffs have suffered, are now suffering, and will continue to suffer emotional pain and mental anguish. Furthermore, as a direct and proximate result of such actions by IBM, Plaintiffs have been, are being, and will be in the future deprived of income in the form of wages and benefits solely because of IBM conduct. Plaintiffs are therefore entitled to all relief under the ADEA, including back pay, the value of lost benefits, prejudgment interest, reinstatement of their former positions, or in the event reinstatement is not feasible, front pay and the value of future benefits, liquidated damages as provided by statute, and their reasonable attorney fees and costs incurred.

**Count 2. Retaliation under the ADEA, 29 U.S.C. § 623(d), and Applicable State Law, on Behalf of Plaintiffs Ross and Clarke.**

56. Plaintiffs Ross and Clarke incorporate by reference all allegations in this Complaint.

57. IBM retaliated against Plaintiffs Ross and Clarke for opposing IBM's unlawful age-discrimination practices, including by terminating their employment and preventing them from obtaining other employment at IBM, in violation of the ADEA, 29 U.S.C. § 623(d), and applicable state law, including but not limited to Mass. Gen. Laws ch. 151B, § 4 and the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.10(1), (7).

58. Plaintiff Ross is a member of a protected class under the FCRA due to her age.

59. Plaintiff Clarke is a member of a protected class under M.G.L. c. 151B, § 1(8) due to her age.

60. Plaintiff Ross exercised or attempted to exercise her rights under the FCRA, thereby engaging in protected activity under the FCRA. Specifically, Plaintiff Ross complained to her front-line manager that she believed she was being treated differently because of her age, and IBM subsequently retaliated by terminating her employment.

61. Plaintiff Clarke exercised or attempted to exercise her rights pursuant to M.G.L. c. 151B, thereby engaging in protected activity pursuant to M.G.L. c. 151B. Specifically, Plaintiff Clarke likewise complained to her front-line manager that she believed she was being treated differently because of her age, and IBM subsequently retaliated by terminating her employment.

62. IBM has taken material adverse actions against both Plaintiffs.

63. IBM's retaliation was knowing, willful, and done with malice.

64. As a direct and proximate result of IBM's retaliation, Plaintiffs Ross and Clarke lost their jobs and sustained, and will continue to sustain, wage and benefit losses, and have incurred, and will continue to incur, out-of-pocket losses, including attorney fees and legal costs.

65. As a direct result of Defendant's pretextual reasons proffered for termination, Plaintiffs Ross and Clarke have lost earning capacity.

**<u>Count 3</u>. Age Discrimination against Plaintiff Ross in Violation of the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.10(1)(a) and otherwise under Florida law.**

66. Plaintiff Ross incorporates by reference all preceding allegations in this Complaint.

67. At all relevant times, IBM was an "employer" pursuant to Fla. Stat. § 760.02(7) because it employed 15 or more employees each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

68. At all relevant times, Plaintiff Ross was a member of a protected class based on her age, was employed by IBM in Florida, and was an "aggrieved person" pursuant to Fla. Stat. § 760.02(10).

69. IBM engaged in unlawful discrimination against Plaintiff Ross by terminating her because of her age in violation of the FCRA, Fla. Stat. § 760.10(1)(a) and otherwise under Florida law. Such discrimination included disparate treatment motivated by Plaintiff's age, and because of such actions by IBM, she has suffered irreparable injury and compensable damages.

70. IBM's actions were willful, wanton, intentional, and done with malice and/or with reckless indifference to Plaintiff's statutorily protected rights.

71. Plaintiff timely filed a charge of discrimination with the EEOC and all conditions to suit have been satisfied.

72. As a direct and proximate result of IBM's age discrimination, Plaintiff Ross has suffered, is now suffering, and will continue to suffer emotional pain and mental anguish. Furthermore, as a direct and proximate result of such actions by IBM, Plaintiff Ross has been, is being, and will be in the future deprived of income in the form of wages and of prospective benefits solely because of IBM's conduct.

**Count 4. Age Discrimination against Plaintiff Clarke in Violation of Massachusetts General Laws ("M.G.L.") c. 151B, § 4(1B) and otherwise under Massachusetts law.**

73. Plaintiff Clarke incorporates by reference all preceding allegations in this Complaint.

74. At all relevant times, IBM was an "employer" pursuant to M.G.L. c. 151B §§ 1(5) and 4(1B).

75. At all relevant times, Plaintiff Clarke was a member of a protected class based on her age pursuant to M.G.L. c. 151B, § 1(8), was employed by IBM in Massachusetts.

76. IBM engaged in unlawful discrimination against Plaintiff Clarke because IBM terminated Plaintiff Clarke because of her age in violation of Massachusetts General Laws c. 151B, § 4(1B). Such discrimination included disparate treatment motivated by Plaintiff's age, and because of such actions by IBM, she has suffered irreparable injury and compensable damages.

77. IBM's actions were willful, wanton, intentional, and done with malice and/or with reckless indifference to Plaintiff's statutorily protected rights.

78. Plaintiff timely filed a charge of discrimination with the EEOC and all conditions to suit have been satisfied.

79. As a direct and proximate result of IBM's age discrimination, Plaintiff Clarke has suffered, is now suffering, and will continue to suffer emotional pain and mental anguish. Furthermore, as a direct and proximate result of such actions by IBM, Plaintiff Clarke has been, is being, and will be in the future deprived of income in the form of wages and of prospective benefits solely because of IBM's conduct.

**Count 5. Age Discrimination against Plaintiff Duffy in Violation of New York State Human Rights Law, N.Y. Executive Law §§ 296(1)(a), 296(3-a), and otherwise under New York law.**

80. Plaintiff Duffy incorporates by reference all preceding allegations in this Complaint.

81. At all relevant times, IBM was an "employer" pursuant to N.Y. Executive Law § 292(5).

82. At all relevant times, Plaintiff Duffy was a member of a protected class based on her age pursuant to N.Y. Executive Law § 296(3-a) and was employed by IBM in New York.

83. IBM engaged in unlawful discrimination against Plaintiff Duffy because IBM terminated Plaintiff Duffy because of her age in violation of N.Y. Executive Law §§ 296(1)(a), 296(3-a), and otherwise under New York law. Such discrimination included disparate treatment motivated by Plaintiff's age, and because of such actions by IBM, she has suffered irreparable injury and compensable damages.

84. IBM's actions were willful, wanton, intentional, and done with malice and/or with reckless indifference to Plaintiff's statutorily protected rights.

85. Plaintiff timely filed a charge of discrimination with the EEOC and all conditions to suit have been satisfied.

86. As a direct and proximate result of IBM's age discrimination, Plaintiff Duffy has suffered, is now suffering, and will continue to suffer emotional pain and mental anguish. Furthermore, as a direct and proximate result of such actions by IBM, Plaintiff Duffy has been, is being, and will be in the future deprived of income in the form of wages and of prospective benefits solely because of IBM's conduct.

## VII. JURY DEMAND

87. Plaintiffs request a trial by jury on all claims against Defendant IBM.

## VIII. PRAYER

88. WHEREFORE: Plaintiffs request the Court enter judgment and relief as follows:

1) That IBM be ordered to pay these Plaintiffs back pay and benefits with interest;
2) That a final judgment in favor of these Plaintiffs against IBM be entered for liquidated damages in an amount equal to the amount of back pay and benefits due to Plaintiffs;
3) That IBM be ordered to reinstate Plaintiffs to their respective former positions with all lost pay and benefits, seniority and promotions;
4) That in the alternative to reinstatement, IBM be required to pay these Plaintiffs front pay and benefits in the event reinstatement is not feasible;
5) Penalties available under applicable laws;
6) Costs of this action incurred herein, including expert fees;

7) Attorneys' fees;

8) Pre-judgment and post-judgment interest, as provided by law; and

9) Such other and further legal and equitable relief as this Court may deem just and proper.

Respectfully submitted,

**WRIGHT & GREENHILL, P.C.**
4700 Mueller Blvd., Suite 200
Austin, Texas 78723
512/476-4600
512/476-5382 (Fax)



By:________________________
Heidi A. Coughlin
Texas State Bar No. 24059615
hcoughlin@w-g.com
Lauren Ross
Texas State Bar No. 24092001
lross@w-g.com

AND

**PATRICK | DOERR PLLC**
1325 Avenue of the Americas, Floor 28
New York, New York 10019
212/680-4052

By: *<u>/s/ Mark T. Doerr</u>*
Mark T. Doerr, Esq.
mark.doerr@patrickdoerr.com

***ATTORNEYS FOR PLAINTIFFS***